### THE BRITANNIA.

### THE M. MITCHELL DAVIS.

(District Court, D. Maryland. May 17, 1918.)

COLLISION ⬅95(2)—VESSEL IN TOW—FAULT OF TUGS.

A collision between a steamship and a car float, against which the steamship, without motive power of her own, was driven by the wind while being moved to another pier in Baltimore Harbor by two tugs, *held* due to the fault of the tugs; the ship having expressly asked for three tugs.

In Admiralty. Suit by Clarence A. Wilson, master of the British steamship Helenus, against the tugs Britannia and M. Mitchell Davis. Decree for libelant.

George Forbes, of Baltimore, Md., for libelant.
Harry N. Abercrombie and Daniel H. Hayne, both of Baltimore, Md., for respondents.

ROSE, District Judge. The libelant is the master of the British steamship Helenus. He asks from the tugs Britannia and M. Mitchell Davis compensation for the damage done his ship by a collision between it and a car float. The same corporation owns both tugs. When the accident happened, they were moving the ship. It was then without motive power of its own. Its movements, as well as those of both the tugs, were directed by the master of the Britannia. If the collision was

caused by his default, both the tugs are liable. The Anthracite, 168 Fed. 693, 94 C. C. A. 179.

The ship had been lying at Pier 7 on the Canton side of the Baltimore Harbor. On the 23d of October, 1917, the libelant told the ship's agents that on the morning of the next day he would be ready to move to the Standard Oil pier, some 1,600 feet further up, and upon the same side of the stream. He said he would like three tugs. The agents replied that it was customary to leave the determination of the number of tugs to be used to the tugboat people. The latter were at once notified to have tugs on hand the next day. For some reason they did not show up at the time indicated. The libelant waited for them until about 11 a. m. The business of the ship then called him to the city. At about 11:45, while at the agent's office, he had the claimant again telephoned to send tugs. In view of the stiff southwest breeze which was blowing, he reiterated his wish for three of them, and this time, at least, his desires in this matter were communicated to the tugboat owner.

Somewhere in the neighborhood of half past 1, or perhaps a little later, the respondent tugs came to the ship, and the master of the Britannia went aboard it and told its first officer, then in charge, that he was there to move it. The ship was of 7,500 tons gross register. It was high out of the water, as it had less than one-fourth of its cargo on board. The wind was blowing from 20 to 25 miles an hour, and the ship was to be moved parallel to a lee shore. In view of these conditions, the first officer asked for three tugs. The master of the Britannia testifies no such request was made. I am satisfied that his recollection is at fault. He replied that they were not needed, as he had just moved a somewhat larger vessel with two. All concerned knew that the ship was without her main steam, and must depend upon the tugs for motive power. The master of the Britannia stationed himself on the ship's bridge, and took charge of her navigation. She was lying alongside of the pier, bow in. He intended that the power to move the ship backward out of the slip, and then, after she had been turned, to carry her forward through the water, and to hold her up against the wind while she was on her journey, should be supplied by the Britannia. The work assigned to the Davis was of another kind. After the ship was clear of Pier 7, it was to turn the ship's bow out, and, when the ship had reached the Standard Oil pier, to reverse the process by pushing the bow in.

Accordingly the Britannia was lashed on the starboard quarter of the Helenus. The tug then backed the ship out of the slip. While the Davis had a line to the starboard bow of the Helenus, it practically took no part in this work. When the ship had cleared the pier ends by perhaps 200 or 250 feet, the Davis pushed its nose against the starboard side of the ship's bow, and thereby turned the stem of the Helenus upstream. Some 15 or 20 minutes was occupied in getting the ship out from the pier and in putting her substantially parallel to the pier ends. The witnesses for the claimant say that she was then 250 feet away from the wharves. The wind was blowing her down on them, and the Britannia, lashed to the ship's starboard quarter, could not

make effective resistance to its force. The master of the Davis says that his tug remained on the starboard bow of the ship until they were off the Baltimore Copper Works, and by that time something more than half of the journey had been completed, an estimate which is confirmed by the harbor charts.[1]

According to the master of the Britannia, the ship was making from 3 to 4 knots an hour. Other witnesses make its speed somewhat less. A ship moving 3 nautical miles an hour covers 300 feet a minute, and 200 feet if it is going only 2 miles an hour. It certainly was not proceeding at a lower rate than 2 miles, so that the time the Davis cast off from the starboard bow to the time of the collision could not have been more than four minutes. Most of the witnesses for both sides make a more liberal estimate as to time, but they are quite certainly mistaken. The importance of this matter will appear later.

The Davis then moved around the stem of the ship and got a line upon the steamship's port bow, taking a position with its own stem towards the ship and at an angle of about 70 degrees to the latter's side. The tug remained in this position for an appreciable time, fixed by its master at five or six minutes. It took him some time to cast off, to go around the bow, to get a heaving line on the ship, then have it bent on the hawser, and to make the latter fast. His testimony shows that, having done all that, he remained on the port bow for what seemed to him a measurable time. It may not have been as much as five or six minutes, as he says. It is very probable it was not, but, from the time when, opposite the Copper Company's Works, he left the starboard bow to the time he cast off the port bow to go back to the ship's quarter, could scarcely have been less than four minutes, and it may have been considerably more, but not more than four minutes could have elapsed between his leaving the starboard bow and the collision.

Under the force of the wind, the ship, so soon as it got out of the slip, began rather rapidly to sag down toward the pier heads. After the Davis had been for some little while on the port bow, the master of the Britannia, in consequence of what he saw himself, and the warnings given him by the ship's company, attempted to prevent the collision by directing the Davis to cast off the port bow of the ship and to get a line on the port quarter, so as to use its power to hold the ship off. He gave the order too late, or the Davis was too slow in obeying. I think the former. In any event, the Davis was not made fast to the ship's port quarter until after the collision. There is a direct conflict of testimony as to why it was not. The master of the Davis and his deck hand say that, before the collision, the latter three times threw a heaving line upon the ship's port quarter before any one on the ship made it fast to the hawser. This assertion is categorically denied by the witnesses from the ship. The facts already stated make it impossible to accept the tug's version. The failure of the claimants to supply a sufficient number of tugs safely, as against the wind then blowing, to

---

[1] On some of the maps, only the Copper Company's wharf, and not its works, are shown. This wharf is only about 400 feet north of Pier 7; but the works themselves are where the master of the Davis places them, namely, 800 feet or thereabouts from Pier 7.

move the ship in the manner in which the master of the Britannia attempted to move it, was the sole cause of the accident.

It is, of course, possible that he could have prevented the collision by sending the Davis to the ship's port quarter the moment he had her headed up stream; but he did not do it, because, if he had used the Davis in that way, he would not have had her available to turn the ship's bow into the Standard Oil slip, as he had planned to do. What he had undertaken to do, as he had originally made up his mind to do it, would have required three tugs. He says he had them at hand. The ship asked him to use them, and warned him of the danger of not doing so; but, self-confident, as his whole manner showed him to be, he refused, and his tugs must bear the resulting loss. It is true that he is a highly skilled tugboat man, with probably more experience in the moving of ships than has any one else hailing from the port of Baltimore. There is no reason to think that he did not suppose that he was acting according to the best of what he had a right to think, as he certainly did think, was an unusually good judgment indeed, however much it may on this occasion have been subconsciously warped by his desire to show that he could do what others thought dangerous to attempt.

"It is quite true that negligence must be determined upon the facts as they appeared at the time, and not by a judgment from actual consequences which then were not to be apprehended by a prudent and competent man. * * * But it is a mistake to say * * * that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent. The standard of conduct, whether left to the jury or laid down by the court, is an external standard, and takes no account of the personal equation of the man concerned. The notion that it 'should be coextensive with the judgment of each individual' was exploded, if it needed exploding, by Chief Justice Tindal in Vaughan v. Menlove, 3 Bing." The Germanic, 196 U. S. 595, 25 Sup. Ct. 318, 49 L. Ed. 610.

The contention of the claimant that the accident was the result of a sudden and unexpected squall, which, in the space of a very few minutes, doubled or nearly doubled the velocity of the wind, is not supported by the facts, and, indeed, is distinctly negatived by the great weight of the testimony.

It follows that the tugs were solely to blame.